(C.D. 4133)

J. J. O'DONNELL WOOLENS, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided November 24, 1970)

*Walter E. Doherty, Jr.,* for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Owen J. Rader* and *Patrick D. Gill,* trial attorneys), for the defendant.

Before RAO and FORD, Judges, and DONLON, Senior Judge

DONLON, Judge: The merchandise in litigation is camel's hair, product of the Mongolian Peoples Republic (referred to as Outer Mongolia), imported from Antwerp on October 7, 1964 at the port of Boston. It is conceded by the parties that it is hair of the camel, in grease, and that the sole issue before the court is whether this hair is, for tariff purposes, sorted. Plaintiff claims that it is not sorted; defendant's contention is that the hair is sorted, and duty was assessed in liquidation at the higher rate provided for the "sorted" classification.

The tariff provisions of TSUS. include, in schedule 3, part 1, subpart C, the following headnote:

1. For the purposes of this subpart—
(a) the term "hair" is limited to hair of the camel, and to hair of the alpaca, cashmere goat, angora goat, and like hair of other animals including the llama, the vicuna, and the angora rabbit;

\*     \*     \*     \*     \*     \*     \*

(i) "sorted" wool or hair is wool or hair separated from each individual fleece according to length, soundness, elasticity, fineness, color, or other properties, but does not include a skirted fleece unless the back has been removed, and does not include skirtings.

Under this schedule the classification was as hair of the camel, in grease, sorted, under item 306.42, with duty charged at 25 cents per clean pound. Although plaintiff's protest claims that the proper classification is under TSUS item 306.51 as hair of the camel, in grease, not sorted, the TSUS reference is clearly a type error and, as the record throughout makes clear, claim actually is for classification under item 306.41, with duty at 24 cents per clean pound.

The record before us includes, by incorporation, the record in *A. H. Ringk & Co.* v. *United States*, 55 Treas. Dec. 488, T.D. 43278 (1929); testimony, adduced by plaintiff, of Mr. Aloysius J. Kelleher, import specialist of the Customs Bureau at Boston with respect to wool and camel's hair and related commodities; the official papers; a sample of merchandise representative of the importation at bar; and a chart, introduced by plaintiff, said to be "Diagrams of sorts represented in various wool fleeces".

Defendant offered no evidence.

The controversy revolves around the TSUS headnote definition of "sorted" wool or hair, and more specifically as to whether the camel's hair at bar was, in the definition sense, separated from a fleece.

It is understandable that nowadays it is difficult to produce in United States courts witnesses who are familiar with the processing of camel's hair in Outer Mongolia. It was not so difficult in 1929, when *Ringk, supra,* was decided. In the *Ringk* trial two witnesses who gave

testimony, one for plaintiff and the other for defendant, had both been to China and had actually seen camel's hair gathering and processing there.

Defendant has conceded that the camel's hair in *Ringk* is "materially" the same as the camel's hair at bar. The record in the *Ringk* case shows that the merchandise there involved was Mongolian camel hair, as this is, and that it was "gathered" by combing out hair of the live camel wherever there appears a shedding of the hair undergrowth.

The hair, as it is combed, is gathered into piles without sorting into grades. These piles are shipped from the interior, in bales, to warehouses where the hair is separated by coolies, prior to exportation, into grades according to such qualities as color and fineness.

Is this separation into grades at warehouse the "sort" which the tariff definition of TSUS intends?

Under the earlier tariff provision applicable in *Ringk*, the court held that such separation does constitute a sort. In paragraph 18, Emergency Tariff Act of 1921, there construed, there is the following provision pertinent to the court's decision:

> * * * On wool and hair provided for in this paragraph, which is sorted or increased in value by the rejection of any part of the original fleece, the duty shall be twice the duty to which it would otherwise be subject, but not more than 45 cents per pound.

The court, in its opinion, stated that "in China camel's hair, which does not come in a fleece like wool, is combed from the back of the animal", adding that it comes "in one piece, all the hair of the animal which is combed off stuck together." (P. 489.)

It will be noted that the TSUS definition of sorted wool or hair is more precise than was the definition in the 1921 Act before the court in *Ringk*. While both definitions presuppose a "fleece", the TSUS definition enumerates the properties into which "sorts" are graded. This statutory enumeration includes both color and fineness, the properties that govern the separation of camel's hair into grades.

What is a "fleece"? Is it a "fleece" from which the camel's hair at bar is separated into grades according to these properties?

Mr. Kelleher, the commodity specialist of the Boston Customs Bureau who testified as plaintiff's witness, had never been to China and had never seen the gathering of camel's hair or its grading in China. His testimony with regard to such processing was conceded to be hearsay.

Mr. Kelleher was of opinion that only sheep have fleeces. Confronted with a dictionary definition of "fleece", he finally admitted that some animals, other than sheep, might have fleeces. The definition put to

him, on cross-examination by defendant, is from Webster's Seventh New Collegiate Dictionary, 1963 edition, which reads as follows:

fleece: 1a: the coat of wool covering a sheep or similar animal b: the quantity of wool shorn at one time  2a: any of various soft or woolly coverings b: a soft bulky deep-piled knitted or woven fabric used chiefly for clothing [P. 318.]

Mr. Kelleher's point of distinction was, or seemed to be, that hair which comes off in clumps, as by combing rather than by shearing, is not a fleece. If he is correct, then it follows that only shorn hair can be the subject of such a sort as would meet the test for tariff classification under TSUS item 306.42.

Our duty is to determine what was the intent of Congress in the language it has used in this tariff enactment. If Mr. Kelleher's opinion is sound, then it seems to follow that inclusion of camel's hair (which is combed, never shorn) in TSUS item 306.42 was nugatory, since only wool bearing animals have fleeces. We do not easily conclude that, notwithstanding such inclusion in precise language, Congress did not intend that camel's hair, imported after grading, is ever to be classified as "sorted" camel's hair because the sort is not from fleeces.

We note, in addition to the definition posed to Mr. Kelleher on cross-examination, other definitions of the noun "fleece" in dictionaries and discussions in trade publications.

In Webster's Third New International Dictionary of the English Language (1963), the noun "fleece" is defined to include the following:

1a: the coat of wool that covers a sheep or similar animal b: the quantity of wool shorn at one time * * * [P. 868.]

In Matthews' "Textile Fibers", 1954 revised edition, there is a section devoted to Camel Hair (pp. 696–700) from which we quote as follows:

The camel hair used in the American wool industry is grown chiefly in Mongolia, Chinese Turkestan, and the Chineses northwestern provinces. * * *

*       *       *       *       *       *       *

Once a year the better kind of camel hair is gathered from the living animals in the molting season in late spring or early summer. It is interesting to note the manner in which the hair is obtained; it is neither sheared nor plucked, as with other fleece-bearing animals. In the spring, as the temperature grows milder, the hair begins to form matted strands and tufts, hanging from head, sides, neck, and legs, from which it falls off in clumps. By the time warm weather has definitely set in, the animal has almost completely lost its coat.

Photographs of caravans often show a man trailing the last camel. He is the "trailer." It should be observed that the animal sheds its fleece not only in the spring, when the greatest quantity is shed; the year round it is rubbing off chunks of hair. The task of the trailer is to pick up the hair as it drops from the camel and place it in baskets provided for that purpose. These baskets are strapped to the last camel in the caravan, and therein is transported the accumulation of the entire journey. The hair is also to be found in the morning at the spot where the caravan rested for the night, the camel having rubbed it off. Where batches appear ready to fall, they are pulled free and stuffed into the baskets. The first town reached by the caravan is usually where the hair is sold, generally to traveling compradores, who, in turn, forward it to the terminals across mountain and desert. Eventually the hair is brought to Tientsin, or to other points of shipment where it is sorted and graded preparatory to export.

\*      \*      \*      \*      \*      \*      \*

The camel carries a mixed fleece similar to the Cashmere goat. The outer hair of the animal is very coarse, tough, and wiry. It may reach a length up to 15 in. Beneath the outer hair is a short, soft down of great fineness which varies in length from 1 to 5 in. The soft down fibers are the valuable product known as "camel hair wool." As the camel loses both coats together during the shedding time, it is very difficult to separate the hairs from the wool fibers. A separation to the extent effected in cashmere is not possible, because a high percentage of heterotypical fibers is present. The type with the thickened tip predominates. The sudden need for a covering after the shedding is probably the stimulating factor of producing hairy medullated fibers, especially with the severe climatic conditions prevailing in Mongolia and Siberia. The best way to separate the down from the hair is through the combing process. In the combing machines the two types of hair are separated, the coarse and long hairs producing the top and the short fibers combing out as noils. The trade grades are based on the amount of coarse fibers still present. \* \* \* [Pp. 696–698.]

There is similar information as to camel hair in the "American Wool Handbook" (1947), at pp. 234–240, where the statement is made:

"The camel carries a mixed fleece similar to the Cashmere goat." [P. 238.]

To be sure, the common reference to fleece has to do with the shorn all-in-one-piece wool taken from sheep. But it is evident, also, that Congress used the term to include fleece other than wool, namely, fleece *hair*, and that there is a long standing industry and commercial acceptance of such usage with respect to Mongolian camels. They are fleece-bearing animals.

Tariff acts speak in the language of commerce. *Marshall Field & Co. v. United States*, 45 CCPA 72, C.A.D. 676 (1958); and other cases, too numerous to require citation.

While in *Ringk, supra*, the court stated that camel's hair does not come in a fleece like wool (p. 489), and it is true that camel fleece is not like the fleece of sheep, the tariff provision under which classification of the *Ringk* merchandise was affirmed provided double duty on wool and hair "which is sorted or increased in value by the rejection of any part of the original fleece * * *." Hence, the court there, in applying the "sorted" classification necessarily found that camel hair, combed or gathered in mass, is such a fleece as, when later separated by grading, is sorted camel's hair in the tariff sense.

The language "separated from each individual fleece" in the TSUS definition of sorted wool on hair does not require that the sorting be from the wool or hair of a single animal. The legislative history indicates that the tariff provisions for "sorted" wool on hair were intended to exclude wool or hair not commercially sortable, but not to exclude wool or hair which could be and was, in fact, sorted. *Tariff Classification Study, First Supplemental Report*, p. 22.

We see nothing in either the record before us or the TSUS provisions in contention, that would warrant any conclusion here different from that in *Ringk, supra*.

The protest claim is overruled. Judgment will be entered accordingly.